UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIA BENNETT

    Plaintiff

v.                                                                          Case No.

HURLEY MEDICAL CENTER                              Hon.

    Defendant

_____

Nicholas Roumel (P37056)
**NACHT & ROUMEL, P.C.**
Attorney for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
nroumel@nachtlaw.com
_____

## COMPLAINT AND JURY DEMAND

Mia Bennett states as follows:

### Preliminary Statement

Ms. Bennett is a second-year undergraduate student at the University of Michigan Flint. She is seeking her BSN (Bachelor of Science in Nursing) and required to complete certain rotations at teaching hospitals. She is also a person with a disability who requires a service dog. Defendant refuses to accommodate Ms. Bennett's service animal, in violation of the Americans with Disabilities Act.

1

## PARTIES/JURISDICTION/ VENUE

1. Plaintiff Mia Bennett ("Mia," "Ms. Bennett") is a resident of Flint, Genesee County, Michigan.

2. Defendant Hurley Medical Center ("Hurley") is a non-profit hospital owned by and located in the City of Flint with its principal offices located at One Hurley Plaza, Flint, Michigan, 48503.

3. The jurisdiction of this court is invoked pursuant to Subtitle A of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131 (the "ADA").

4. The state law claims in this lawsuit are based on violations of Michigan's Persons with Disabilities Civil Rights Act, MCL § 37.1101 et seq. (the "PWDCRA")

5. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and over state claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the Eastern District of Michigan as all parties are located within of the Eastern District of Michigan and the events described in this lawsuit took place primarily in the Eastern District of Michigan.

## FACTUAL ALLEGATIONS

### Mia's Disability

7. Mia has been diagnosed with general anxiety disorder with a history of panic attacks.

8. Her service dog, "Pistol," is a Pembroke Welsh Corgi who is trained to sense and avoid an impending panic attack. For example, he can detect a rise in Mia's heart rate among other anxious behaviors, such as nervous repetitive movements. Pistol is trained to interrupt those behaviors, such as by jumping on Mia's leg. When he does this, Mia is reminded to take medication to forestall the panic attack.

9. The medication, Ativan, is effective at preventing panic attacks. However, it also causes side effects such as drowsiness, dizziness, loss of coordination, headache, nausea, and blurred vision.[1] For that reason, Mia tries to avoid taking Ativan as much as possible in the hospital setting, where she seeks to remain as alert and oriented as possible in the course of assisting with patient care.

10. If she does not have Pistol by her side, Mia has little choice but to either take the risk of a panic attack, or to proactively take an Ativan and endure the side effects described above. This is less than ideal and precisely the reason she requires the service animal.

---

[1] https://www.webmd.com/drugs/2/drug-6685/ativan-oral/details

11. Her medical provider has stated, "[Mia's] anxiety attacks can come on quickly with little to no apparent warning. Her service animal will alert her to physiological signs of an episode that allow her to take steps to avoid a panic attack."

### Hurley's Policies

12. Hurley Medical Center describes itself as a "public teaching hospital" maintaining affiliations with the University of Michigan, among many other educational institutions. [https://www.hurleymc.com/about-us/mission-and-history] It maintains an ADA compliant policy regarding service animals. [Exh A]

13. Under that policy, a service animal is permitted to accompany the person throughout the facility if it performs work "directly related to the individual's disability." Examples of such work include what Pistol does for Mia: "assistant an individual during a seizure, … or helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors."

### Mia's Education

14. Ms. Bennett is a second-year undergraduate student at the University of Michigan Flint's campus ("UM Flint").

15. She is seeking her BSN (Bachelor of Science in Nursing) and required to complete certain rotations at teaching hospitals.

16. In connection with her studies, she was assigned to commence a rotation at Hurley for the fall, 2020 semester.

17. It is important to bear in mind that Mia's presence at Hurley was only once weekly, for a four-hour shift on Wednesdays from 7 – 11 AM.

18. She was to be placed at 7th Floor East. Her duties would be under the supervision of Shannon Ash (a UM faculty member).

19. At the end of the semester, she would be evaluated by Ms. Ash.

20. The rotation would be used as a "building block" for future rotations. In other words, what Mia learned at the fall, 2020 rotation at Hurley was intended to give her the skills and experience necessary to successfully complete future rotations at Hurley and other teaching hospitals.

**Mia's Accommodation Request**

21. When Mia began her rotation at Hurley in September, 2020, her accommodation request was approved. She received an email stating as follows:

> From: **Summer Jenkins** <sjenkin1@hurleymc.com>
> Date: Tue, Sep 8, 2020 at 1:19 PM
> Subject: ADA approved
> To: <Bennetmm@umich.edu>
>
> Hello Mia,
>
> Your accommodation request has been approved and includes:
>
> - Utilization of trained service dog throughout the course of training.
> - Periodic bathroom breaks for service dog.
> - Upon alert from the service dog of an episode, you may take necessary steps to avoid attack.
>
> Use of the service dog should comply w/ Standard Practice 4050 (attached).
>
> All the best,
> Summer A. Jenkins
> 810-262-9476
> Human Resources - Benefits, Compensation & Recruitment

22.  However, that status did not last long. A week later, Ms. Bennett received another email from Ms. Jenkins that stated in relevant part:

> Upon your placement on the 7E floor, we were made aware of several allergic reactions caused by the dog in both employees and patients, including one individual that required medical treatment. At that time, it was necessary to re-evaluate our ability to reasonably accommodate. We researched any options that would not pose a direct threat and would not require a fundamental alteration in the hospital's policies, practices, or procedures. However, we are unable to allow a dog on either floor where your training could occur, 7E and 9E. These are the only two floors where your clinical training can take place and it has been confirmed that there are dog allergies on both.

23.  On information and belief, Ms. Bennett disputes Hurley's characterization that multiple persons were significantly affected; she acknowledges that one staff member apparently had an allergic reaction.

24. In any event, Hurley forbade Ms. Bennett to have her service dog accompany her during her rotation, just one week after she was approved.

25. This was contrary to their own policy [Exh A] which assured:

C. **Allergies/phobia**: In the event that a patient or a Facility staff member is allergic to, or has a phobia about animals, the Facility shall further modify its policies, practices and procedures to permit a Service Animal to remain with a patient in an inpatient room by, for example, **moving the patient to another comparable room, changing staff schedules, or using other nondiscriminatory methods** so that the presence of the Service Animal would not pose a direct threat and would not require a fundamental alteration in the Facility's policies, practices, or procedures. Any patient or staff member with an allergy to animals shall provide verification within a reasonable time frame of request. [Emphasis added]

24. Here, instead of moving any affected patients or workers, Hurley separated Mia and Pistol. They required that she "crate" Pistol and place him in an isolated room, which she could "visit" during her shift.

25. By depriving Mia of the very benefit Pistol provided – sensing anxiety attacks so that she could prevent them – Hurley not only placed Mia in danger of suffering a panic attack, but also in doing so, violated its own policy.

26. With the cooperation and assistance of the University of Michigan, Mia was able to make alternate course arrangements, but at significant hardship and inconvenience to her.

27. Hurley's violation of its own policy, and failure to accommodate Mia's disability, deprived her of the educational benefit of the rotation.

28. Hurley's failure to accommodate Mia's disability left her with the following unsatisfactory choices: (a) not attend her rotation; (b) prophylactically take an Ativan before her rotation, which would dull her senses and place patients at risk; (c) attend a rotation at a different teaching hospital that would accommodate her, but at considerable distance and inconvenience.

29. Although the fall, 2020 semester is over, future rotations would typically be scheduled by UM Flint for the duration of Ms. Bennett's educational career. This dispute is likely to arise again.

## Professional Standards and Recommendations

30. In addition to violating its own standards, Hurley is afoul of the recommendations of other governmental and professional organizations.

31. For example, the United States Department of Justice Civil Rights Division has issued "Frequently Asked Questions about Service Animals and the ADA." [Exh B] They have determined with no ambiguity that Pistol is a proper service animal, stating in relevant part:

> If the dog has been trained to sense that an anxiety attack is about to happen and take a specific action to help avoid the attack or lessen its impact, that would qualify as a service animal.

32. Furthermore, Hurley should be required to move the person with an allergy, rather than the disabled person, unless they can prove that would "fundamentally alter" the services they provide:

8

The ADA does not require covered entities to modify policies, practices, or procedures if it would "fundamentally alter" the nature of the goods, services, programs, or activities provided to the public. [Id., p. 5]

33. Similarly, accommodations suggested by the Job Accommodation Network[2] all maintain the bond between the disabled person and the service animal, even if employees are allergic to or afraid of the animal. These include:

❏ Allowing the employees to work in different areas of the building or in private offices, or to travel on different paths in the building;

❏ Implementing flexible scheduling so that the employees do not work together at the same time or do not use common areas at the same time;

❏ Using portable air purifiers or adding HEPA filters to the existing ventilation system;

❏ Regularly cleaning the work area, including carpets and window treatments;

❏ Asking the disabled employee to use dander-care products regularly when cleaning the service animal;

❏ Arranging alternatives to in-person communication, such as teleworking;

❏ Allowing allergic coworkers to take periodic rest breaks if needed to take medication.

All of these accommodations are available to Hurley.

---

[2] Office of Disability Employment Policy Job Accommodation Network. (2011, June 17). Service animals in the workplace. Available at http://askjan.org/media/servanim.html ; Pender, K. (May 20, 2016). [Incorporated herein by reference]

34. Even more pertinent, the <u>Journal of Professional Nursing</u>, *"Preparing for a student with a service animal"* (March 2020, Exh C) specifically addresses the situation, as here, where a student requires a service animal in a professional setting: "This article provides guidance to nursing programs to plan for a quality educational experience for a student with a service animal while ensuring patient safety and the continuation of efficient clinical operations." [Id., p. 1]

35. Continuing, the article emphasizes both "the need for nursing faculty to carefully plan to educate students with a service animal" as well as "educating others about the rights of students with this type of animal." [Id.] To that end, it necessitates "Addressing allergy and fear" and admonishes, "Under ADA guidelines, service animals may not be restricted due to allergies or fear of dogs (DOJ, Civil Rights Division, 2009)[3] among those whom their handler encounters."

---

[3] Under the updated 2010 guidelines, "Allergies and fear of dogs are not valid reasons for denying access or refusing service to people using service animals. When a person who is allergic to dog dander and a person who uses a service animal must spend time in the same room or facility, for example, in a school classroom or at a homeless shelter, they both should be accommodated by assigning them, if possible, to different locations within the room or different rooms in the facility." [https://www.ada.gov/service_animals_2010.htm]

36. Instead, it is suggested that the dog wear a protective therapy cape, and that high efficiency particulate air filters be used to reduce dander in the air. [Id., p. 2] Case examples are further provided to demonstrate various ways the service dog may be accommodated within the hospital. [Id.]

## LEGAL ALLEGATIONS

*Count I – ADA Title II*

37. As suggested above, the underpinnings of Ms. Bennett's right to be accompanied by her service dog at Hurley is in the Americans with Disabilities Act, Title II ("ADA").

38. Hurley is a public entity within the meaning of the ADA, 42 USC § 12131, 28 CFR § 35.104.

39. Ms. Bennett is a qualified individual with a disability within the meaning of the ADA, 42 USC § 12131, 28 CFR § 35.104 and 28 CFR § 35.108.

40. Hurley is in violation of the ADA, 42 USC § 12132, 28 CFR § 35.130, by *inter alia*:

> (a) Excluding Plaintiff from participation in or be denied the benefits of the services, programs, or activities of a public entity,
>
> (b) Subjecting Plaintiff to discrimination, and
>
> (c) Otherwise limiting Ms. Bennett in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or services offered by Hurley.

41. Hurley is in violation of the ADA, 42 USC § 12132, 28 CFR §§ 35.106-107 by failing to sufficiently provide required notice and information to applicants, participants, beneficiaries, and other interested persons information regarding its obligations under the ADA, including the designation of a responsible employee and availability of grievance procedures.

42. Hurley's violations of the ADA, Title II, have damaged Ms. Bennett as set forth herein and below.

*Count II – Section 504 of the Rehabilitation Act of 1973*

43. Hurley's discrimination against Ms. Bennett, as described herein, is also in violation of Section 504 of the Rehabilitation Act of 1973, 29 USC § 701 *et seq.* (Section 504).

44. Section 504, in relevant part, prohibits discrimination against people with disabilities in "programs and activities" that get federal funding.

45. Hurley is a program or entity within the ambit of Section 504, 29 USC § 794.

46. Ms. Bennett is a person with a disability as defined by Section 504, 29 USC § 705, sections (9) and (20).

47. Hurley is discriminating against Ms. Bennett in violation of Section 504, 29 USC § 794.

48. Hurley's discrimination has damaged Ms. Bennett as defined herein and below.

*Count III – Persons with Disabilities Civil Rights Act*

49. Hurley's discrimination against Ms. Bennett, as described herein, is also in violation Michigan's Persons With Disabilities Civil Rights Act, MCL § 37.1101 *et seq.* (the "PWDCRA")

50. Ms. Bennett has a disability as defined by MCL § 37.1103.

51. Hurley is a place of public accommodation and/or a public service as defined by § 37.1301.

52. Hurley is discriminating against Ms. Bennett in violation of Section MCL 37.1302 (a).

53. Hurley's discrimination has damaged Ms. Bennett as defined herein and below.

**Damages**

54. As a result of Hurley's discriminatory practices, Ms. Bennett has suffered stress and emotional distress, anxiety, annoyance and inconvenience, interference with education and educational opportunities, and other non-economic damages.

55. Mia's damages may be considerable even if she is neither failed nor otherwise penalized for not completing her rotations. As these educational opportunities are cumulative, she would be at a disadvantage in future rotations and classes, and be at risk for suffering disadvantage for the nursing board and employment opportunities.

56. Under the ADA and Section 504, an aggrieved person may be entitled to compensatory damages, injunctive relief, and attorney fees; the same is true under PWDCRA.

### Jury Demand

Plaintiff demands a trial by jury on all issues so triable.

### Relief Requested

*W H E R E F O R E*  Mia Bennett requests this honorable court grant her the following as permitted by law and equity:

    a.    compensatory damages;

    b.    equitable and/or injunctive relief;

    c.    compensable costs, interest, and reasonable attorney fees;

    d.    any other relief as permitted under the law to vindicate her rights as a person with a disability.

                                                      Respectfully submitted,

                                                      Attorneys for Mia Bennett
                                                      NACHT & ROUMEL, P.C.

March 1, 2021                                                  Nicholas Roumel