UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIA BENNETT,                                  Case No. 21-cv-10471

       Plaintiff,                          Paul D. Borman
                             United States District Judge
v.

                             David R. Grand
HURLEY MEDICAL CENTER,                        Chief United States Magistrate Judge

       Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 14)

## INTRODUCTION

This case arises out of Plaintiff Mia Bennett's request as a student intern to bring her service dog, Pistol, with her on her clinical nursing rotation at Defendant Hurley Medical Center. Hurley initially granted Bennett's request for accommodation, to allow Pistol to accompany Bennett throughout her rotation. However, after Pistol initially caused severe dog-allergy reactions in a patient and a member of the staff on floor 7E, Hurley withdrew its accommodation of Pistol accompanying Bennett on her rounds. Floor 7E accommodated patients with very serious medical issues.

After Hurley denied her requests to reconsider this withdrawal, Bennett sued under the Americans with Disabilities Act, 42 USC § 12132 *et seq.*, the

Rehabilitation Act of 1973, 29 USC § 701 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 *et seq.*

Now before the Court is Hurley's Motion for Summary Judgment. (ECF No. 14.) For the reasons that follow, the Court will **GRANT** the Motion.


## I. STATEMENT OF FACTS & PROCEDURAL HISTORY

### A. Statement of Facts

**Bennett has Generalized Anxiety Disorder and panic attacks.**

In 2017, Plaintiff Mia Bennett, a nursing student at the University of Michigan–Flint, (ECF No. 14-2, PageID 147–48), was diagnosed with "Generalized Anxiety Disorder [('GAD')] with a history of panic attacks." (ECF No. 14-2, Dep. of M. Bennett, PageID 155; ECF No. 16-3, Provider Statement, PageID 466.) These panic attacks can last "for over an hour," (ECF No. 14-2, PageID 159), and "can come on quickly with little to no apparent warning," (ECF No. 16-3, PageID 466). During an untreated attack, Bennett's "heart rate goes up" and she experiences "shortness of breath, tightness in [her] chest," and "a feeling of impending doom." (ECF No. 14-2, PageID 159.) The attacks also "cause[] intense fear of recurrence." (ECF No. 16-2, Application for Accommodation, PageID 464.)

**Bennett treats her panic attacks with both a dog and medication.**

Bennett contends that her dog—"Pistol," a Pembroke Welsh Corgi—helps her to minimize these attacks. (ECF No. 1, Complaint, PageID 3.) Bennett got Pistol about nine years ago, when he was a puppy. (ECF No. 14-2, PageID 154.) Around five years ago, when she was first diagnosed with GAD, Bennett began to home-train Pistol to be a "medical alert dog." (ECF No. 14-2, PageID 154–55.) Though she had some help, Bennett "primarily" trained Pistol by herself, and she continues his training to this day. (ECF No. 14-2, PageID 154–55.) Specifically, Bennett has trained Pistol to "detect [a] rise in [her] . . . anxious behaviors" and "signal[] [her] to take [her] medication to stop [a] panic attack" before she could otherwise recognize it. (ECF No. 14-2, PageID 160–63; ECF No. 16-2, PageID 464.)

Her medication is called Ativan. It usually works to stop a panic attack within "five to ten minutes." (ECF No. 14-2, PageID 159.) However, "it also causes side effects such as drowsiness, dizziness, loss of coordination, headache, nausea, and blurred vision." (ECF No. 1, PageID 3) (citing *Ativan: Side Effects*, WebMD https://www.webmd.com/drugs/2/drug-6685/ativan-oral-details [https://perma.cc/ 6DAP-LY3G]). "For that reason, [Bennett] tries to avoid taking Ativan as much as possible in the hospital setting" during her internships and prefers not to take it unless and until an attack is imminent. (ECF No. 1, PageID 3.)

Since training Pistol to alert her to oncoming panic attacks, Bennett has had them "drastically" less often. (ECF No. 14-2, PageID 160.) Pistol and his training have also "enabled [Bennett] to" live her life "without fear of having a major [] attack." (ECF No. 16-2, PageID 464.)

**Bennett was assigned to Hurley Medical Center for her first clinical nursing rotation.**

As a UM-Flint nursing student, Bennett is required to complete clinical training rotations that complement her coursework at nearby hospitals each semester. (ECF No. 14-2, PageID 148–50.)

Bennett's first rotation, in "fundamentals of nursing," was set to begin at Defendant Hurley Medical Center in the fall of 2020. (ECF No. 14-2, PageID 150.) Bennett would work at Hurley, following doctors and nurses making their rounds of patients' rooms, for four hours a week, on Wednesdays, for six weeks. (ECF No. 14, Motion for Summary Judgment, PageID 117; ECF No. 14-6, Dep. of S. Jenkins, PageID 293–94; ECF No. 17, Response to Motion for Summary Judgment, PageID 785.) She would intern on floor 7E, supervised by a member of UM–Flint's nursing faculty. (ECF No. 14-6, PageID 287–88; ECF No. 14-8, Dep. of T. Bourque, PageID 394.)

A "variety of patients" receive treatment on 7E, including "a lot of infectious disease" patients, "congestive heart failure" patients, "vascular patients," and some "postsurgical patients." (ECF No. 14-4, Dep. of T. Martin, PageID 248–49.) 7E was

also "the designated unit to do [continuous ambulatory peritoneal dialysis] and so . . . most of the medical physicians and renal physicians have their patients" there. (ECF No. 14-4, PageID 249.) "A lot of renal patients are immunocompromised." (ECF No. 14-4, PageID 250.)[1]

**Bennett sought to bring Pistol with her on her rotation.**

About two weeks before the start of this rotation, Bennett emailed Robin Johnson, at Hurley's Human Resources Department, to apply for an accommodation that would allow her "to utilize" Pistol during her rotation. (ECF No. 16-2, PageID 464; ECF No. 16-3, PageID 466; ECF No. 16-5, Aug. 26, 2020 M. Bennett ETO R. Johnson, PageID 504.) In addition to her own description of her request, Bennett's Application included a Provider Statement from Susan Cox, MA, LPC, confirming that Pistol would "alert [Bennett] to physiological signs of an episode that allow her to take steps to avoid a panic attack." (ECF No. 16-3, PageID 466.)

Johnson forwarded the Application to Summer Jenkins, who was then Hurley's Benefits, Compensation, and Recruitment Manager. (ECF No. 14-6, PageID 273; ECF No. 16-5, PageID 504.) Though she was responsible for handling ADA requests from all employees, Jenkins had never previously "dealt with a request for a service dog." (ECF No. 14-6, PageID 274–75.)

---

[1] There is conflicting testimony on whether any patients on 7E are unconscious during their stays. *Compare* (ECF No. 14-4, PageID 250), *with* (ECF No. 14-10, Affidavit of P. Bade, PageID 421).

Jenkins discussed the Application with Peter Bade, Hurley's legal counsel. (ECF No. 14-6, PageID 285.) She also read Hurley's Standard Practices and "did a very quick and dirty Google search on service animals." (ECF No. 14-6, PageID 286.) She did not ask Bennett for any further information. (ECF No. 14-6, PageID 285.)

On September 8, 2020, Jenkins approved Bennett's request via email. (ECF No. 16-8, Sept. 8, 2020 S. Jenkins ETO M. Bennett, PageID 523.) She also stated that "[u]se of the service dog should comply w/ [Hurley's] Standard Practice 4050." (ECF No. 16-8, PageID 523.)

**Hurley's Standard Practices address the use of service animals.**

Standard Practice 4050 provides, in relevant part:

**I. POLICY**

The ADA allows a Service Animal that is accompanying a person with a Disability to be at any Hurley Medical Center facility ("Facility"). . . .

While a Service Animal must be permitted to accompany a person with a Disability almost everywhere within the Facility, there are some places in the Facility that are not safe for Service Animals; these areas are discussed in greater detail in section VI.

. . .

**VI. WHEN A SERVICE ANIMAL'S ACCESS MAY BE LIMITED**

A Service Animal is permitted in areas of the Facility where patients or the public are allowed, provided the presence of the animal does not require modification of policies, practices, or procedures, if such modification would fundamentally alter the goods, services, program,

or activity of the Facility; or would jeopardize the safe operation of the Facility . . . .

A. **Inpatient and Outpatient Areas:** A Service Animal is generally permitted in inpatient and outpatient areas unless an individualized assessment is made to exclude a Service Animal. This assessment shall be based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: the nature, duration and severity of the risk; the probability that a potential injury will actually occur; and whether any reasonable modifications of policies, practices or procedures or the provision of auxiliary aids or services will mitigate the risk.

   1. **Restricted Areas:**
   Areas where a Service Animal generally ***cannot*** be permitted to access include limited-access areas that employ greater than general infection-control measures and patient units where a patient is immunosuppressed or in isolation. These areas include but are not limited to operating rooms, post anesthesia recovery unit, and all other critical care areas.

   2. **Inpatient rooms:**
   If a determination is made that a Service Animal cannot remain in the room assigned to the patient, the patient will be offered the option of being placed in another comparable room, if available.

   3. **Visitors:**
   Service Animals are generally permitted in accordance with Facility policy for all visitors; including, but not limited to, ICU visitation rules for number of visitors and duration of visit. If the visitor is not permitted to bring the Service Animal into a particular area then the Facility shall offer the visitor and the patient an accommodation including, but not limited to, transferring the patient to another comparable room where unrestricted visits could occur, or allowing the visit to occur in a different area that affords equivalent privacy and amenities.

B. **Visits with Service Animals:** In the event a Service Animal is not permitted in an inpatient room, Facility staff shall, upon a patient's request, arrange for visits between a Service Animal and its Handler

7

or a visitor who uses a Service Animal in an area of equivalent privacy and amenities.

C. **<u>Allergies/phobia:</u>** In the event that a patient or a Facility staff member is allergic to, or has a phobia about animals, the Facility shall further modify its policies, practices and procedures to permit a Service Animal to remain with a patient in an inpatient room by, for example, moving the patient to another comparable room, changing staff schedules, or using other nondiscriminatory methods so that the presence of the Service Animal would not pose a direct threat and would not require a fundamental alteration in the Facility's policies, practices, or procedures. Any patient or staff member with an allergy to animals shall provide verification within a reasonable time frame of request.

(ECF No. 14-5, Standard Practices: Service Animals, PageID 260–64.)

**Pistol caused allergic reactions on his and Bennett's first day at Hurley.**

On September 9, 2020, Bennett brought Pistol with her to start her rotation. But problems soon arose. Alexis Neal, the unit clerk for 7E, who was stationed "[o]ut in the open at the nurses station . . . in the middle of the unit," reported to Tarnesa Martin, her Nurse Manager, that "her throat was swollen[ and] getting tight, []she was starting to have a hard time breathing, her eyes were itchy, [and] she was a little diaphoretic." (ECF No. 14-4, PageID 223, 229–30.) She explained "that she had severe allergies to dogs." (ECF No. 14-4, PageID 230.) Martin "sent [Neal] to occupational health," and Neal ended up leaving for the rest of the ninth and the tenth, returning on the eleventh. (ECF No. 14-4, PageID 232–33.)

After sending Neal home, Martin "reassign[ed] the assistant nurse manager[, Keysha Gates,] her duties" and personally "helped as well." (ECF No. 14-4, PageID

8

232–34, 246.) This reshuffling "caused a burden on the unit" because it left them "short a person" and required the assistant nurse manager to "sit at the nurses station and not be[] mobile." (ECF No. 14-4, PageID 246.) But Martin could not bring another unit clerk in to replace Neal because "[t]hey didn't have anybody to send to the unit midday." (ECF No. 14-4, PageID 246.)

Also on September 9, Martin learned that Tanesha Hippolyte, a nurse on 7E who was off on the ninth but typically worked "every other Wednesday," also "had severe allergies to dogs." (ECF No. 14-4, PageID 235–36.) In response, Martin rearranged the schedule so that Hippolyte would not work on 7E on Wednesdays for the rest of Bennett's rotation. (ECF No. 14-4, PageID 236.)

A patient also had an allergic reaction to Pistol. Gates told Martin that a patient "called out asking was there a dog on the unit because they was starting to have some of the same symptoms that [Neal] had." (ECF No. 14-4, PageID 237.) At her deposition, Martin thought that this patient was discharged that day or the next. (ECF No. 14-4, PageID 243–44.)

**Jenkins reevaluated and then withdrew Bennett's accommodation.**

When she learned of the severe allergic reactions of staff and at least one patient, Jenkins took the lead on "reevaluating [Bennett's] accommodation." (ECF No. 14-6, PageID 287–88.) In this reevaluation, she spoke with Martin, Bade, Teresa Bourque (a more senior nurse administrator (ECF No. 14-8, PageID 383)), and

9

Jennifer McDermitt (a clinical specialist and liaison between Hurley and nursing schools (ECF No. 14-3, Dep. of J. McDermitt, PageID 188)). (ECF No. 14-6, PageID 289.) Bourque told Jenkins that she had "infection control . . . concerns about a nurse . . . handling a leash and [] taking care of a patient." (ECF No. 14-8, PageID 390.)[2]

At her deposition, Jenkins thought that she "may have notified [Bennett] by email . . . about the accommodation being reevaluated," (ECF No. 14-6, PageID 290), but the record includes no such email. Regardless, Jenkins did "have [] phone communications" with Bennett between September 8 and 15. (ECF No. 14-6, PageID 289.) And during these communications, Bennett and Jenkins discussed the possibility of putting Pistol in a shed defender, which is "a lycra type of body suit" that "minimize[s] the likelihood of somebody being allergic to" a dog. (ECF No. 14-2, PageID 169.)

In the morning of September 15, Bennett emailed Jenkins:

> Good morning,
> I inquired about the shed defender and they said they would not fit his breed. I'm looking for other options, or possibly seeing if my mom could alter it to fit.
> Thank you,
> Mia Bennett

---

[2] Bennett testified that she would not "hold a leash at all" during rounds because she had a "cross-body leash." (ECF No. 14-2, PageID 170.) However, she did note that she would have to "handle" the leash if she was "going to sit [Pistol] in a corner" because of crowding—in that event, she would "stay him" and "hand sanitize" right after. (ECF No. 14-2, PageID 170.)

Bourque testified that she did not know that Bennett used this type of leash. (ECF No. 14-8, PageID 390.)

(ECF No. 14-9, Sept. 15, 2020 M. Bennett ETO S. Jenkins, PageID 417.) Bennett

testified that Jenkins "never replied" to this email, (ECF No. 14-2, PageID 169–70),

and that she herself never followed up on it either, (ECF No. 14-2, PageID 173–74).

That afternoon, Jenkins emailed Bennett, on a new thread:

Hello Mia,

On September 8th, your request for a service dog as an accommodation was approved.  This approval included you to utilize your service dog through the course of your training here at Hurley Medical Center, with the expectation that the presence of the animal would not alter activity of the hospital.

Upon your placement on the 7E floor, we were made aware of several allergic reactions caused by the dog in both employees and patients, including one individual that required medical treatment.  At that time, it was necessary to re-evaluate our ability to reasonably accommodate. We researched any options that would not pose a direct threat and would not require a fundamental alteration in the hospital's policies, practices, or procedures.  However, we are unable to allow a dog on either floor where your training could occur, 7E and 9E.[3]  These are the only two floors where your clinical training can take place and it has been confirmed that there are dog allergies on both.

The reasonable accommodation that we are able to present moving forward is the capability to crate your service animal during direct patient care timeframes with the opportunity to take necessary breaks as needed either from your own demands or the dogs.

---

[3] At their depositions, Bourque and McDermitt both suggested that Bennet could not actually have been moved to 9E, because she would not have had a UM–Flint instructor on that floor. (ECF No. 14-3, PageID 198–206; ECF No. 14-8, PageID 394.) On the other hand, at her deposition, Bennett thought that she could have completed her rotation on "any med surg floor." (ECF No. 14-2, PageID 151.)

> We remain open to continued dialogue on this matter.  However, at this time Hurley will not permit the service animal to accompany you while on 7E or 9E.
>
> All the best,
> Summer A. Jenkins

(ECF No. 14-9, Sept. 15, 2020 S. Jenkins ETO M. Bennett, PageID 418.)

Jenkins testified that after she sent this email "the shed defender . . . was still on the table" and Hurley "had not closed out the fact that there could have been still options," but it "just [had not] receive[d] any that could work at that time." (ECF No. 14-6, PageID 292–93.) She added that "[t]he timing of th[is] email needed to occur because [Bennett] was scheduled to report" to work the next day, September 16. (ECF No. 14-6, PageID 293.)

Bennett did report to work on the sixteenth—without Pistol. (ECF No. 14-6, PageID 294.)

**Bennett and Hurley continued to discuss Bennett's requested accommodation.**

On September 17, Bennett responded to Jenkins' email:

> Good Morning Summer,
>
> I received your email regarding my accommodation for my service dog. While I appreciate the revised accommodation offer, it will not work for the proper utilization of the service dog. I would like to take you up on your offer of continued dialogue on this matter. Can you meet via Zoom or Google Meet? I would like to include Dr. Megan Keiser who is the Director of Undergraduate Nursing and Chip Evans who is the Disability Services Coordinator from University of Michigan – Flint. Would it be possible to meet this week or early next week? I have

12

clinicals next Wednesday and it would be ideal to meet before then. Thank you again for your help in this matter.

Regards,
Mia Marissa Bennett

(ECF No. 16-12, Sept. 17, 2020 M. Bennett ETO S. Jenkins, PageID 585.)

Within ten minutes, Jenkins replied:

Yes, of course.  Please allow me to touch base with those that should be present from Hurley and I will share a few different dates and times to coordinate.

(ECF No. 16-12, PageID 585).

After a quick back-and-forth, the two set a Google meeting for September 21.

(ECF No. 16-13, Sept. 17, 2020 S. Jenkins ETO M. Bennett, PageID 587–88.)

The meeting took place as scheduled, with Jenkins as Hurley's only representative. (ECF No. 14-6, PageID 295.) It was tense. According to Jenkins, Bennett did not "speak[] at all," but Keiser and Evans advocated "aggressive[ly]" on her behalf, telling Jenkins that she "didn't have a choice" and "had to accommodate" Bennett by "letting [Pistol] accompany her." (ECF No. 14-6, PageID 296.)[4]

Jenkins sent a follow-up email the next day:

Mia: in an effort to accommodate your ADA request, Hurley remains willing to allow your service dog on premises, albeit in a crate that is not located on the patient floors where you are assigned.

---

[4] Sometime in October, Bade had a similarly "contentious" conversation with Kelly Cruz and Jack Bernard from University of Michigan's general counsel. (ECF No. 16-20, Dep. of P. Bade, PageID 742–43.)

We will also work with your instructors to ensure numerous regularly scheduled breaks during which you would have the ability to spend time with your service dog.  In addition, if at any time you need to leave a patient floor due to your disability, Hurley will make every effort to accommodate unscheduled breaks.

Unfortunately, your request to have the service dog accompany you while on the patient floors (7 and 9) is not reasonable.  As previously stated, when the service dog accompanied you on the in-patient floor, numerous individuals complained of allergic reactions, including a patient and staff members, one of whom was medically treated.

During yesterday's discussion with you, Dr. Megan Keiser, and Chip Evans, it was suggested that Hurley relocate any patient that has a dog allergy to another floor.  Likewise, it was suggested staff members with a dog allergy be relocated.  These proposals are unworkable and would directly compromise patient care.  As such, they do not constitute reasonable accommodation.

Finally, Mr. Evans referenced Hurley's Service Animals standard practice, but neglected to note salient provisions.  As stated in Section VI, a service animal will not be permitted if "such modification would ….jeopardize the safe operation of the Facility."  The policy makes clear that an "individualized assessment" must be made "based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain:  the nature, duration, and severity of risk; the probability that a potential injury will actually occur; and whether any reasonable modifications of policies, practices or procedures or the provision of auxiliary aids or services will mitigate risk."

In this case, Hurley Human Resources, in conjunction with Risk/Legal, has had extensive dialogue with medical care providers to assess your accommodation request.  Based on that dialogue and the objective evidence, it is our conclusion that allowing your service dog to accompany you during educational duties on in-patient floors 7 & 9 creates a unreasonably high probability that patient care will be adversely affected.  While we strive to accommodate your disability,

you have not presented and we have not identified any reasonable modifications that will overcome the risk of harm to our patients.

All the best,
Summer A. Jenkins

(ECF No. 16-14, Sept. 22, 2020 S. Jenkins ETO M. Bennett, PageID 590–91.)

Jenkins testified that she "would have shared" this email with Bade before sending it. (ECF No. 14-6, PageID 297.)

**Bourque, Martin, and Bade agreed with Jenkins that Hurley's ability to move staff was limited.**

In an Affidavit submitted for this case, Bade stated that "[s]taffing was a problem [for Hurley] during the pandemic." (ECF No. 14-10, PageID 422.) And "[e]ven pre-pandemic," he elaborated, "Hurley cannot just move employees between floors and departments" because it "is a union hospital" and thus "collective bargaining agreements place limits on [its] ability to move employees from one unit to another." (ECF No. 14-10, PageID 422.)

Martin explained at her deposition that, because of these collective bargaining agreements, she has to "go to supplemental staffing"—a "pool" of "extra nurses" on-call—to ask for staff replacements, "instead of going directly to another floor." (ECF No. 14-4, PageID 246–48.) She also testified that "there [have] been times when [she has] asked supplemental staffing for a nurse and they don't have one for" her. (ECF No. 14-4, PageID 247.)

Bourque echoed these characterizations of the collective bargaining agreements, and she added that at Hurley "there are certain procedures that . . . only nurses on one floor do that [nurses on] another floor [do not do]." (ECF No. 14-8, PageID 402.)

**Bourque and Martin agreed with Jenkins that Hurley's ability to move patients was limited.**

Bourque also testified that moving patients could cause issues because Hurley "like[s] the same nurses to take care of the same patients" to maintain "continuity of care." (ECF No. 14-8, PageID 403.) She said that this continuity is important because "nursing is about relationships" and nurses can better care for patients with whom they have an ongoing relationship. (ECF No. 14-8, pageID 403.)

Martin testified to similar concerns. She opined that "[i]t's not that easy" to move a patient because "patients are assigned to [specific] areas . . . because of the medical condition they have." (ECF No. 14-4, PageID 248.) She also noted that during Bennett's rotation Hurley was "pretty much . . . packed." (ECF No. 14-4, PageID 248.)

Additionally, both women stated that Hurley screens patients for some allergies at intake, but not for allergies to dogs. (ECF No. 14-4, PageID 239; ECF No. 14-8, PageID 403.) Bourque added that she "work[s] with [] electronic record" software and has "never seen" a question about pet allergies "in any of the foundation questions." (ECF No. 14-8, PageID 405.)

16

**Hurley found a spot for Pistol on the 8th floor.**

After Jenkins sent the September 22 email, Hurley's staff had additional internal

"[c]onversations . . . [about] where [they] had space for [Pistol] to crate." (ECF No.

14-6, PageID 306–07.) On October 6, Jenkins emailed Bennett again:

> In an effort to work with your accommodation request we are able to allow you space on the 8th floor to crate your dog while you are delivering patient care on either the 7th or 9th floors.
>
> As noted previously, numerous regularly scheduled breaks will be provided during which you would have the ability to spend time with your service dog.  In addition, if at any time you need to leave a patient floor due to your disability, Hurley will make every effort to accommodate unscheduled breaks.
>
> All the best,
> Summer A. Jenkins

(ECF No. 16-15, Oct. 6, 2020 S. Jenkins ETO M. Bennett, PageID 593.)

At some point, Hurley also offered to "provide [Bennett] with tutoring so that

[she] could make up for any deficit that happened by not physically being able to

make rounds for [her] rotation." (ECF No. 14-2, PageID 167.) But, according to

Bennett, tutoring could not "replicate the patient experience." (ECF No. 14-2,

PageID 167.)

**Bennett finished her rotation without Pistol.**

Bennett finished her rotation at Hurley, on 7E, without Pistol, (ECF No. 14-2,

PageID 152), and without suffering any panic attacks.

**Bennett has now completed additional rotations with and without Pistol.**

At the time of her deposition, Bennett had also completed a Mental Health rotation at Hurley and a Med Surg 1 rotation at Genesys Hospital, and she was in the midst of completing a Med Surg 2 rotation at McLaren Hospital. (ECF No. 14-2, PageID 152.) Bennett did not bring Pistol to the former rotation but did bring him to the latter two. (ECF No. 14-2, PageID 153.)

Bennett testified that "since the incident at Hurley [she] ha[d] not had one patient have a complaint" about Pistol. (ECF No. 14-2, PageID 167.)

**B. Procedural History**

On March 1, 2021, Bennett filed a Complaint in this Court, asserting three counts against Hurley. (ECF No. 1.)

First, Bennett alleged that Hurley violated Title II of the Americans with Disabilities Act ("ADA"), 42 USC § 12132, 28 CFR § 35.130, "by *inter alia*":

(a) Excluding Plaintiff from participation in or [denying] the benefits of the services, programs, or activities of a public entity,

(b) Subjecting Plaintiff to discrimination, and

(c) Otherwise limiting Ms. Bennett in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or services offered by Hurley.

(ECF No. 1, PageID 11.)

Second, Bennett alleged that Hurley violated "Section 504 of the Rehabilitation Act of 1973, 29 USC § 701 *et seq.*" for the same reasons that it violated the ADA. (ECF No. 1, PageID 12.)

And third, Bennett alleged that Hurley violated "Michigan's Persons With Disabilities Civil Rights Act, MCL § 37.1101 *et seq.* (the 'PWDCRA')" for the same reasons again. (ECF No. 1, PageID 13.)

Hurley answered Bennett's Complaint on March 24, 2021. (ECF No. 4.) Discovery concluded on February 28, 2022. (ECF No. 13, PageID 102.)

Hurley moved for summary judgment on March 31, 2022. (ECF No. 14) Bennett responded on May 5 and amended her Response on May 6. (ECF Nos. 16–17.) Hurley replied on May 19. (ECF No. 18.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). And a

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Still, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. And the Court may only consider evidence that could be presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

"The 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Rather, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks

20

and citations omitted). In other words, "'[t]he central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## III. ANALYSIS

Congress enacted the ADA to "eliminat[e] [] discrimination against individuals with disabilities" in "such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101.

Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. "Two types of claims are cognizable under Title II: claims for intentional discrimination and claims for a reasonable accommodation." *Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Comm'rs*, 870 F.3d 471, 488 (6th Cir. 2017). Hurley has moved for summary judgment on both types of claims.

**A. The Court GRANTS Hurley summary judgment on Bennett's claim that Hurley intentionally discriminated against her in violation of the ADA.**

Hurley argues that its "refusal to let [Bennett] take *Pistol* (not all dogs) *on floors 7[E] and 9[E]* (not all floors) was in response to patient and employee complaints, and the fact that she might be disabled does not transform Hurley's reaction into intentional discrimination." (ECF No. 14, PageID 134) (emphasis Hurley's) (citing *Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir. 2005) and *Hamm v. City of Gahanna*, 109 F. App'x 744 (6th Cir. 2004)).

Bennett does not address this intentional discrimination argument in her Response to Hurley's motion. Instead, she focuses entirely on her reasonable accommodation claim.

The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Accordingly, to the extent that Bennett ever meant to assert a claim for intentional discrimination, the Court finds that Bennett has now abandoned that claim.

**B. The Court GRANTS Hurley summary judgment on Bennett's claim that Hurley denied her a reasonable accommodation in violation of the ADA.**

The Department of Justice's regulations implementing the ADA are entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837

(1984) and have been followed by the cases cited throughout this Section. These

regulations establish a "'general rule' that requiring covered actors to make

modifications to permit the use of service animals is reasonable." *Berardelli v. Allied*

*Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 118 (3d Cir. 2018) (citing 28 C.F.R.

§ 35.136, *Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319, 1336

(S.D. Fla. 2015), and *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052,

1060 (5th Cir. 1997)). Under this rule:

> A covered actor [] violates [the ADA] per se if it denies a disabled
> person's request to be accompanied by . . . her service animal unless
> one of four exceptions apply: (i) granting access would fundamentally
> alter the nature of the program; (ii) the animal poses a direct threat to
> the health or safety of others; (iii) the animal is out of control; or (iv)
> the animal is not housebroken.

*C.G. by & through P.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 440 (E.D.

Pa. 2021) (citing 28 C.F.R. §§ 35.130(b)(7)(i), 35.136(b)(1)–(2), and 35.139 (along

with 36.302, a Title III regulation)); *see also Berardelli*, 900 F.3d at 119–20.

In a publication providing Guidance on these regulations—which is entitled to

deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) and has been cited

approvingly in cases cited throughout this Section—the DOJ has elaborated:

> Under the ADA, State and local governments, businesses, and nonprofit
> organizations that serve the public generally must allow service animals
> to accompany people with disabilities in all areas of the facility where
> the public is allowed to go. For example, in a hospital it usually would
> be inappropriate to exclude a service animal from areas such as patient
> rooms, clinics, cafeterias, or examination rooms. However, it may be
> appropriate to exclude a service animal from operating rooms or burn

units where the animal's presence may compromise a sterile environment.

. . .

Allergies and fear of dogs are not valid reasons for denying access or refusing service to people using service animals. When a person who is allergic to dog dander and a person who uses a service animal must spend time in the same room or facility, for example, in a school classroom or at a homeless shelter, they both should be accommodated by assigning them, if possible, to different locations within the room or different rooms in the facility.

Dep't of Just., Civil Rights Division, *Service Animals* (July 12, 2011), https://www.ada.gov/service_animals_2010.htm [https://perma.cc/JJR9-WP6J] (last updated Feb. 24, 2020); *see also Entine v. Lissner*, No. 17-cv-946, 2017 WL 5507619, at *6 (S.D. Ohio Nov. 17, 2017) (citing this Guidance and setting forth the framework listed above).

"[F]or the purposes of this motion," Hurley does "not dispute whether Plaintiff is a qualified individual with a disability." (ECF No. 14, PageID 122.) Instead, it argues that is entitled to summary judgment on Bennett's ADA reasonable accommodation claim for six other reasons: 1) Bennett "was not excluded from her rotation"; 2) Bennett "doesn't need an accommodation"; 3) "Pistol is not a service animal"; 4) "[a]llowing [Bennett] to bring Pistol to her rotation would fundamentally alter the nature of the rotation"; 5) "Pistol jeopardized the health and safety of patients and staff"; and 6) Bennett "failed to appropriately engage in the interactive process."

24

(ECF No. 14, PageID 124–130.) The Court finds that Hurley's fifth reason entitles it to summary judgment here.

### 1. Pistol was a direct threat to health and safety.

The ADA's regulations state that they "do[] not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a). The regulations further explain that:

> In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

*Id.* at 35.139(b); *see also* 28 C.F.R. § 35.130(h) ("A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.").

Direct threat is an affirmative defense. *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1085 (N.D. Cal. 2013) (stating that a defendant "bears a 'heavy burden' to show that that [a service dog] is a direct and significant risk to the health and safety

of others." (quoting *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066

(9th Cir. 2007))).

In *Rose*, the Western District of Missouri found that defendant Cox permissibly

excluded a service monkey from its hospital and college "food service

establishments" as a direct threat after an individualized assessment. *Rose v.

Springfield-Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1210, 1216–17 (W.D.

Mo. 2009), *aff'd sub nom. Rose v. Cox Health Sys.*, 377 F. App'x 573 (8th Cir. 2010).

The Court described that sufficient assessment as follows:

> Cox consulted with the Director of Infection Prevention at CoxHealth, an infectious disease physician at CoxHealth, federal Centers for Disease Control guidelines regarding service animals in hospitals, and Cox's own policies regarding service animals. The experts and the guidelines all recommended against allowing a monkey access to medical facilities because of the high risk for zoonotic disease transmission. The guidelines and experts also warned that primates present a significant risk of unpredictable violent behavior and may interfere with patient confidentiality. In addition to the recommendation of its experts and warnings in the guidelines, Cox also had the letter from [Springfield–Greene County Health Department] indicating that allowing the monkey access to food service establishments (which Cox operated at multiple facilities) would violate certain provisions of Missouri law related to health and cleanliness.

*Id.* at 1216–17. Additionally, the Court "kept in mind" that the plaintiff had "sought

to bring [the] monkey into Cox facilities on a regular basis." *Id.* at 1217.

In *Tamara*, on the other hand, the Northern District of California found that a

hospital violated the ADA when it excluded a service dog from a psychiatric ward

for being a direct threat. *Tamara*, 964 F. Supp. 2d at 1085–86. That court faulted the hospital for excluding the dog "based upon a general hospital policy," without "conduct[ing] an individualized assessment," and without "consider[ing] . . . changes in practices or policies that would [have] mitigate[d] any direct threat." *Id.*

### Arguments

Hurley argues that Pistol was a direct threat to patients and staff. It states that "dogs transmit" "coronaviruses" and "numerous zoonotic pathogens, including bacteria, parasites and fungi." (ECF No. 14, PageID 118) (citing Anastasia N Vlasova et al., *Novel Canine Coronavirus Isolated from a Hospitalized Patient with Pneumonia in East Malaysia*, 74 Clinical Infectious Diseases 446 (2022), available at https://academic.oup.com/cid/article/74/3/446/6278597 [https://perma.cc/S54W-9XME]). It notes that "some of" "the patients on the floors where [Bennett was assigned]"—which presumably means 7E—"are post surgical patients." (ECF No. 14, PageID 118) (citing ECF No. 14-4, PageID 248–49). It claims that "many of" the patients on that floor "arrive unconscious[] and can't be screened for dog allergies." (ECF No. 14, PageID 118) (citing ECF No. 14-10). And it contends that it could not "move the patients" because other parts of the hospital were not "equipped to deal with their medical needs." (ECF No. 14, PageID 127.)

Hurley further argues that "[s]ubstituting a nurse [who is allergic to Pistol] for part of a shift once a week poses safety concerns" because it disrupts "continuity of care." (ECF No. 14, PageID 119) (citing ECF No. 14-8, PageID 402–03).

In conclusion, Hurley asserts that "if a hospital can't keep a dog out of the rooms with post-surgical patients when employees and patients have already manifested an allergy to that particular dog, the 'legitimate safety requirements' affirmative defense is essentially meaningless." (ECF No. 14, PageID 129) (quoting *Pool v. Riverside Health Servs., Inc.*, No. 94-1430, 1995 WL 519129, at \*4–5 (D. Kan. Aug. 25, 1995) ("Service animals provide to thousands of Americans a critical means of access to the world. Federal policy as reflected in the ADA is designed to support this access. This policy, however, is not unlimited; it does not compel hospitals to jeopardize the health and safety of their patients.")).

Bennett does not directly respond to this direct threat argument, but she does emphasize that a "'public entity must ensure that its safety requirements **are based on actual risks, not on mere speculation**, stereotypes, or generalizations about individuals with disabilities.'" (ECF No. 17, PageID 802) (quoting 28 C.F.R. § 35.130(h) (emphasis Bennett's)).

In her Preliminary Statement, Bennett also notes that Jenkins' emails to her "only cite the allergic reactions" to support Hurley's alleged safety concerns. (ECF No. 17, PageID 793) (citing ECF No. 14-9, PageID 418; ECF No. 16-14). Additionally,

she states that she was not included in the "conversations to crate" Pistol and "[a]ll witnesses testified that other than reviewing the two pages in her accommodation request, that none of them had any additional information about [her] disability or [Pistol.]" (ECF No. 17, PageID 792) (citing ECF No. 14-3, PageID 192; ECF No. 14-6, PageID 298–99; ECF No. 14-8, PageID 391; ECF No. 16-17, Dep. of J. Overman, PageID 641; ECF No. 16-20, PageID 734, 738–39).[5]

Bennett maintains that "it is not difficult to accommodate a student nurse with a service animal" and "had Hurley not terminated the interactive process with Ms. Bennett . . . they could have considered many possible accommodations that would not have required separating Ms. Bennett and Pistol." (ECF No. 17, PageID 794.)

*Analysis*

No reasonable jury could dispute that Hurley did conduct an individualized assessment and reasonably concluded that Pistol, who would have accompanied Bennett to every patient on her rounds with doctors and nurses, was a direct threat to the health and safety of all the patients and staff on 7E and 9E.

---

[5] Review of these citations clarifies that these witnesses testified that they did not have additional information about Bennett's medical condition. They did not testify that they had no additional information about Pistol outside of his role in alleviating Bennett's panic attacks.

29

First, Hurley conducted a proper individualized assessment before excluding Pistol as a direct threat, as required by § 35.139(b). In an email to Bennett, Jenkins wrote that:

> *Hurley Human Resources, in conjunction with Risk/Legal, has had extensive dialogue with medical care providers to assess your accommodation request. Based on that dialogue and the objective evidence*, it is our conclusion that allowing your service dog to accompany you during educational duties on in-patient floors 7 & 9 creates a unreasonably high probability that patient care will be adversely affected.

(ECF No. 16-14, PageID 591) (emphasis added). Bennett has not disputed this representation.

Furthermore, Bennett's response to Hurley's motion for summary judgment on this point is ineffectual. *See* (ECF No. 17, PageID 801–04.) Hurley barred Pistol from future presence on 7E and 9E *only after* he actually caused allergic reactions; it did not act based purely on speculation or generalizations. Additionally, Hurley's offer of allowing Pistol to stay in a crate on the eighth floor, (ECF No. 14-9, PageID 418; ECF No. 16-5, PageID 593)—even if not satisfactory to Bennett, (ECF No. 16-12, PageID 585)—demonstrates that Hurley assessed whether a modification could mitigate the risk Pistol posed without fully excluding him.

It is also worth noting that Hurley only discovered the problems with Pistol after Bennett had already started her rotation and therefore had limited time to assess the situation and look for a solution that would balance Bennett's needs with the needs

of its staff and patients. *See Lockett*, 496 F.3d at 1066 (taking into account a defendant's limited time to make its decision when holding that it properly excluded a dog for being a direct threat to health and safety of others).

Second, it was reasonable for Hurley to conclude that Pistol posed a direct and considerable threat to the health and safety of all of Hurley's patients and staff on 7E and 9E, as required by § 35.139(a). The evidence shows that Pistol at the very least carried allergens. In less than a day, Pistol triggered an allergic reaction in Neal that was so strong that she sought medical care and was out for two days, (ECF No. 14-4, PageID 229–33), and he also triggered a reaction in a patient with dog allergies who did not even see Pistol, (ECF No. 14-4, PageID 237). Moreover, Pistol's disbursement of allergens was especially dangerous on 7E, because some of its patients are immunocompromised, (ECF No. 14-4, PageID 250), and needed to stay on that floor for their care, (ECF No. 14-4, PageID 248). Pistol's allergens would have been similarly dangerous to the patients on 9E, which is an "[o]ncology medical unit." (ECF No. 14-3, PageID 195.) And even if Hurley could have rearranged staff schedules to find a team of nurses without dog allergies,[6] doing so would have disrupted continuity of care by the assigned nurses, further endangering patients. (ECF No. 14-8, PageID 403.)

---

[6] As noted above, at least two nurses on 7E had dog allergies (ECF No. 14-4, PageID 230, 235–36.) And Bennett has not disputed Jenkins' assertion that an employee on 9E had dog allergies too. (ECF No. 14-9, PageID 418.)

Finally, the Guidance on allergies to service dogs does not control here, because this case involves a special situation, in which a service dog would repeatedly come within close proximity to all of the vulnerable, immunocompromised hospital patients of floors 7 and 9. *Cf.  Rose*, 668 F. Supp. 2d at 1217 (considering that a plaintiff sought to bring a service animal to facilities "on a regular basis" rather than just once); *Hedrick v. OhioHealth Corp.*, No.19-cv-1326, 2021 WL 4306096, at *6 (S.D. Ohio Sept. 22, 2021) ("Because allowing a dog into these sensitive areas increases the risk of infection to more vulnerable patients, and thus interferes with their own rights, requiring OhioHealth to accommodate Plaintiff by allowing her dog to enter would fundamentally alter these areas.").

### 2. Hurley did not obstruct the interactive process.

At the end of her section responding to Hurley's interactive process argument, Bennett asserts that Hurley's alleged failure to engage in the interactive process "demonstrate[s]" on its own a "violation of the ADA." (ECF No. 17, PageID 804.). But the Court finds that Hurley did not fail to engage in the required process.

### Legal Framework

The Sixth Circuit has explained that:

> The ADA's regulations indicate that, to determine the appropriate reasonable accommodation for a given employee, it may be necessary for the employer to initiate an informal, interactive process with the employee. The purpose of this process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. Accordingly,

> the interactive process requires communication and good-faith exploration of possible accommodations. Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith. When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (internal quotation marks, alterations, and citations to 29 C.F.R. § 1630.2(*o*)(3), along with cases, omitted). And it has elaborated:

> An employee has the burden of proposing an initial accommodation, and the employer has the burden of showing how the accommodation would cause an undue hardship, but the employer is not required to propose a counter accommodation in order to participate in the interactive process in good faith. Of course, taking the extra step of proposing counter accommodations may be additional evidence of good faith. If an employer takes that step and offers a reasonable counter accommodation, the employee cannot demand a different accommodation. An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff.

*Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010).

The regulation this requirement derives from, the above-cited cases, and all of the other cases cited by Hurley on this issue, are from Title I. But the Sixth Circuit has suggested that a similar requirement applies in the Title II context. For example, in *Marble*—albeit an unpublished case—it stated that, "when a disabled individual requests accommodation under Title II, the covered entity must give 'individualized attention' to that request," and it characterized this "individualized inquiry" as Title

33

II's version of the "interactive process." *Marble v. Tennessee*, 767 F. App'x 647, 652, 652 n.3 (6th Cir. 2019); *see also Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 840 (6th Cir. 2018) (evaluating whether a university being sued under Title II violated the "interactive process," though acknowledging that holdings on the issue were "in the employment context").

### Arguments

Hurley notes that it originally granted Bennett's request but then "withdrew the accommodation due to the safety and welfare of staff and patients." (ECF No. 14, PageID 131–32.) It states that it "proposed a counter reasonable accommodation: [Bennett] c[ould] have complete access to Pistol but Pistol ha[d] to stay in a separate room so he[ was] not around the patients and the staff." (ECF No. 14, PageID 132.) And it asserts that Bennett, in response, "didn't come back with a counter. She said no." (ECF No. 14, PageID 132.)

Hurley acknowledges that Bennett "*discussed* bringing a shed defender," but maintains that it "did not say no" to that. (ECF No. 14, PageID 132) (emphasis Hurley's). Instead, Hurley contends, Bennett "stopped negotiating," even though it "has always made it clear that it is willing to listen to proposals which will accommodate [Bennett] while also accommodating the staff and the patients." (ECF No. 14, PageID 132) (citing *Walsh v. United Parcel Serv.*, 201 F.3d 718, 725 (6th Cir. 2000), *Kleiber*, 485 F.3d at 871, *Lafata v. Church of Christ Home for the Aged*,

325 F. App'x 416, 422 (6th Cir. 2009), *EEOC v. Sears, Roebuck & Co.*, 417 F.3d

789, 805 (7th Cir. 2005), *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th

Cir. 1996), and *Jakubowski*, 627 F.3d 195).

Bennett disagrees, maintaining that Hurley is the one that "terminated the

interactive process." (ECF No. 17, PageID 804.) She argues that Hurley "unilaterally

revoked [her] accommodation, without consulting [her] or even looking beyond her

initial ADA application documents." (ECF No. 17, PageID 804.) And she states that

"[w]hile it did discuss the matter with her and her advocates, [Hurley] refused to

yield." (ECF No. 17, PageID 804.) She then asserts that she "followed up on her

phone conversation with Ms. Jenkins, stating that she looked into the Shed Defender,

and although she cannot get a standard one, she would try to have a custom one

made," but Jenkins and Hurley "never responded." (ECF No. 17, PageID 804.)

Hurley replies that it "didn't ignore" Bennett's email about the Shed Defender,

but rather "waited to hear back from" her as she "said she was looking for other

options." (ECF No. 18, PageID 807.) It notes that its next email to her stated, "we

remain open to continued dialog on this matter. However, *at this time* Hurley will

not permit the service animal to accompany you while on 7E or 9E." (ECF No. 18,

PageID 807) (emphasis Hurley's). And it avers that Bennett "never got back to [it]

to say whether she had successfully located or modified a Shed Defender." (ECF

No. 18, PageID 807.)

*Analysis*

Bennett has not offered sufficient evidence from which a reasonable jury could conclude that Hurley caused a breakdown in the interactive process. The only factual allegations that Bennett makes here are that Hurley 1) revoked her accommodation without consulting her, and 2) never responded to her email about the shed defender. Neither allegation shows that Hurley acted obstructively or in bad faith.

Bennett presents no evidence to support the first allegation. Neither does she ever dispute Jenkins' testimony that Jenkins "ha[d] phone communications with [Bennett]" between September 8th and 15th (ECF No. 14-6, PageID 289), when Jenkins finally emailed Bennett withdrawing her accommodation, (ECF No. 14-9, PageID 418.) Perhaps more importantly, in that withdrawal email, Jenkins emphasized that Hurley "remain[ed] open to continue dialogue on th[e] matter" but "at *th[at]* time Hurley w[ould] not permit [Pistol] to accompany [Bennett] on 7E or 9E." (ECF No. 14-9, PageID 418.) This language made it clear that Hurley was keeping the interactive process open.

The second allegation does not evince misconduct either. In Bennett's email about the shed defender, she wrote that she was "looking for other options," and she did not ask any questions of Jenkins. (ECF No. 14-9, PageID 417.) Accordingly, it was reasonable for Jenkins to assume that Bennett would email again after she had looked into those options and if she found a solution that Hurley had not, or if she

36

had a question, or if she needed something from Hurley. Bennett never followed up. (ECF No. 14-2, PageID 173–74.)

And again, Jenkins emphasized in the email sent later that day that Hurley "remain[ed] open to continued dialogue." (ECF No. 14-9, PageID 418.) Indeed, when Bennett asked for a Zoom meeting two days later, Jenkins agreed to it within ten minutes. (ECF No. 16-12, PageID 585.)

So, given the contents of Bennett's shed defender email, and the context surrounding it, Hurley's lack of response did not amount to a termination of the interactive process.

## C. The Court GRANTS Hurley summary judgment on Bennett's Rehabilitation Act and PWDCRA claims.

The parties agree that Bennett's Rehabilitation Act and PWDCRA claims should be resolved consistently with her ADA reasonable accommodation claim. (ECF No. 14, PageID 135; ECF No. 17, PageID 799, 804.) Therefore, the Court finds that Hurley is entitled to summary judgment on these claims for the same reasons that it is entitled to summary judgment on Bennett's ADA reasonable accommodation claim.

## CONCLUSION

The Court **GRANTS** Hurley's Motion for Summary Judgment. This case is **DISMISSED**.


**IT IS SO ORDERED.**

s/Paul D. Borman

Dated: January 19, 2023

Paul D. Borman
United States District Judge